UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In re:                                                                    Chapter 11

**PARK SIDE ESTATES, LLC,**                              Case No. 13-22198 (RDD)

                         Debtor.
-----------------------------------------------------------X

**JOINT REPLY OF CLASSON ESTATES LLC AND CLASSON
ESTATES I LLC (A) IN SUPPORT OF THE DEBTOR'S MOTION FOR
(I) AN ORDER (A) APPROVING BIDDING PROCEDURES, ENTRY INTO
STALKING HORSE AGREEMENT AND BID PROTECTIONS IN
CONNECTION WITH THE SALE OF THE DEBTOR'S REAL PROPERTY AND
IMPROVEMENTS LOCATED AT 143 AND 159 CLASSON AVENUE,
BROOKLYN, NEW YORK; (B) APPROVING FORM AND MANNER OF
NOTICE; AND (C) SCHEDULING AN AUCTION AND SALE HEARING
AND (II) AN ORDER AUTHORIZING AND APPROVING THE SALE OF THE
DEBTOR'S REAL PROPERTY AND (B) IN REPLY TO THE OBJECTION
FILED TO THE SALE MOTION**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

      Classon Estates LLC ("Classon") and Classon Estates I LLC ("Classon I," and together with Classon, the "Classon Entities") by their undersigned attorneys, hereby file this reply (the "Reply") in support of the Debtor's Motion for (I) An Order (A) Approving Bidding Procedures,[1] Entry into Stalking Horse Agreement and Bid Protections in Connection with the Sale of the Debtor's Real Property and Improvements Located at 143 and 159 Classon Avenue, Brooklyn, New York; (B) Approving Form and Manner of Notice; and (C) Scheduling an Auction and Sale Hearing and (II) An Order Authorizing and Approving the Sale of the Debtor's Real Property (the "Motion") [D.I. 39] and in reply to the objection (the "Objection") filed by the so-called "Non-Occupant, Interest Holders of

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

435896/002-4302006.4

Certain Units at 143 and 159 Classon Avenue" (the "159 Objectors"), and in support thereof respectfully state as follows:

## SUMMARY REPLY

1. As acknowledged by the Debtor, this case is a single asset real estate case that has languished for the first four months while the secured creditor, The Community Preservation Corporation ("CPC"), continued its exhaustive efforts to find a buyer for its $21.57 million first priority foreclosure judgment (the "Foreclosure Judgment")[2] against the Debtor's real property and improvements thereon located at 143 and 159 Classon Avenue, Brooklyn, New York 11205 (the "Property"). After more than a year of trying to sell its Foreclosure Judgment, only one buyer showed up, Classon. The reason for this is clear. No payments were ever made by the Debtor on the mortgages and the Debtor has no ability to make any payments in the future. Construction on the buildings ceased over two years ago. The original condominium plans have expired. The Property has been vandalized and standing water and mold in the basement are becoming a serious concern. The building located at 159 Classon Avenue is vacant and in a complete state of disrepair. It needs extensive additional construction work projected at a cost in excess of $4.5 million before a certificate of occupancy can be obtained. The building located at 143 Classon Avenue also needs significant additional repairs. Even though the 143 Classon building has no certificate of occupancy or approved condominium plan, 13 families nonetheless moved in nearly two years ago and are occupying units in the building (the "143 Occupants"). Before Classon

---

[2] Although irrelevant to the merits of the Motion, the Objectors misstate the facts concerning the Judgment. (*See Objection* at ¶ 16). CPC obtained the original Judgment on default, but thereafter the Debtor and its principals moved to vacate the default judgment as well as commenced a separate lender liability action against CPC in Rockland County, alleging essentially the same claims that they did in opposition to the foreclosure action. The state court denied the motion to vacate on the grounds that the Debtor and its principals had failed to allege any *bona fide* defenses to CPC's mortgage debt. The separate Rockland County action was also subsequently dismissed *with prejudice*.

acquired the mortgage loan, the receiver of the Property appointed in the foreclosure action had commenced eviction proceedings against the 143 Occupants.

2. Prior to acquiring CPC's Foreclosure Judgment, the principal of Classon met with the 143 Occupants and their counsel, and met separately with the 159 Objectors and their prior counsel, to see if they would be interested in acquiring for new moneys advanced a participation interest with Classon in the CPC Foreclosure Judgment. The 143 Occupants, represented by counsel, agreed and advanced approximately $2.4 million in new funds to acquire a junior participation interest in the Foreclosure Judgment. In connection with their participation agreement, the 143 Occupants and Classon also entered into an Option Agreement, pursuant to which each 143 Occupant has the right to exercise an option to purchase a specific unit in the 143 Classon building at an agreed-to purchase price if and when Classon acquires title and has the legal right to offer the condominium units for sale, and receive a credit against the purchase price in full satisfaction of the amount of their participation interest in the Foreclosure Judgment.[3]

3. Unlike the 143 Occupants, the 159 Objectors declined Classon's proposal. As a result, Classon made other arrangements to obtain the rest of the funds needed to acquire the Foreclosure Judgment.

4. In acquiring the Foreclosure Judgment, Classon's original intent was to move against the Debtor for immediate relief from the automatic stay and proceed with the previously scheduled foreclosure sale. However, after extensive negotiations with Debtor's counsel, Classon and the Debtor were able to reach an agreement in principal whereby the Debtor would move for the appointment of an agreed-upon chief restructuring officer (the

---

[3] The parties also entered into Occupancy Agreements, to address what would happen if any 143 Occupant failed to close on the sale of the unit yet stilled occupied the unit.

3

"CRO"), Classon or its affiliate would provide the Debtor with a DIP loan, and the Debtor and Classon I would enter into a stalking horse agreement for the sale of the Property, subject to higher and better offers with a minimum overbid of $15,155,500, plus the participation agreement of $2.4 million.  The overbid amount was set at approximately $4 million below the amount of the Foreclosure Judgment in order to entice potential bidders to submit a bid.  As part of the negotiations with the Debtor, the Debtor extracted a significant concession from Classon that after the Court approved Classon I (or another bidder) as the Successful Bidder and entered the Sale Order, the closing would be held in escrow for a short period of time to allow the Debtor an opportunity to confirm a chapter 11 plan in this case.  Classon further agreed as part of the chapter 11 plan to make available some funds to be distributed pro rata to unsecured creditors if they support the plan.  As a condition to this agreement, it was agreed that, if for any reason the Debtor cannot get its plan confirmed within the agreed-to deadlines, Classon I could immediately proceed to close on the sale of the Property.  The parties have now proceeded on this agreed-to track.

5.    Despite extensive prepetition and postpetition marketing efforts by CPC to sell its mortgage loan and over thirty days of aggressive marketing by the CRO, including numerous notice publications, no one else submitted a bid prior to or at the Auction and the Debtor declared Classon I the Successful Bidder.

6.    The only objection filed to the proposed sale is by the 159 Objectors.  In their Objection, the 159 Objectors throw up a laundry-list of baseless objections hoping that something will stick.  Their unabashed goal is to delay the sale of the Property to Classon I for as long as possible in the hope of obtaining some unfair advantage by causing Classon to

4

incur further economic loss. The Court should summarily overrule each of these objections.

## I. To the Extent the 159 Objectors Have Any Interest in these Cases, It is as Equity Holders of the Debtor, Not Creditors

7. The 159 Objectors allege that they acquired certain interests in the Property pursuant to agreements with the Debtor's principals.[4] The Classon Entities dispute the existence or validity of these agreements and contend that, to the extent the 159 Objectors have any interest in the Property, such interest is an equity interest which in no way should affect the sale of the Property to Classon I. By this Response, the Classon Entities incorporate herein and join in the response filed by the Debtor [D.I. 70].

## II. The Classon Entities Timely Complied with the Subpoena

8. Initially, the 159 Objectors complain that the Debtor and the Classon Entities have somehow attempted to delay or obfuscate the 159 Objectors' receipt of relevant documents. This is completely false. On June 24, 2013, the 159 Objectors' counsel served subpoena *duces tecum* on the Classon Entities' counsel, a copy of which is annexed hereto as Exhibit A.[5] The subpoena only sought production of a few identified documents returnable a week later on Monday, July 1, 2013. Shortly after receiving the subpoena, counsel to Classon reached out to the 159 Objectors' counsel, Mr. Fox, to confirm that he was only seeking the few documents identified in the subpoena and advised that he would need to enter into a standard form of confidentiality agreement before certain of the documents

---

[4] These alleged contracts were entered into with the Debtor's principals as individuals and not with the Debtor itself. Thus any alleged claims the 159 Objectors may have are not against the Debtor, but rather against the Debtor's principals individually.

[5] The subpoenas were improperly served in the name of counsel to the Classon Entities, but the Classon Entities nonetheless agreed to accept service and comply with the subpoenas as if they had been properly served on them instead of their counsel.

5

could be produced. Mr. Fox asked for a copy of the confidentiality agreement and then advised that he wanted copies of a substantially larger number of documents than originally requested, including copies of Classon's entire loan file and other agreements. Counsel to Classon then sent Mr. Fox its standard form of confidentiality agreement, to which he sent back a markup which struck most of the operative paragraphs, essentially making the agreement useless.

9. Nevertheless, in an effort to get around Mr. Fox's obvious attempt to make it appear as if Classon was refusing to timely produce responsive documents as a basis for seeking a further delay of the sale hearing, counsel for Classon timely sent to Mr. Fox by overnight mail <u>on July 1st, the date Mr. Fox requested the production</u>, a redweld containing approximately 600 pages of non-confidential responsive documents. After Mr. Fox once again refused to execute an appropriate confidentiality agreement, counsel for Classon sent Mr. Fox a second redweld containing approximately 200 pages of confidential documents on July 2nd. In order to get around the confidentiality issue, counsel to Classon redacted the few lines of confidential information contained in the documents, such as the names of the prospective bidders contacted by the CRO, before producing the documents.

### III. Failure to Prove Imposition of Constructive Trust

8. Although they fail to explain how legally the 159 Objectors can establish the elements of a constructive trust against the Property, let alone how such an unrecorded trust interest arising out of supposed secret agreements written in Hebrew and held by an undisclosed Rabbi in Williamsburg could be senior to Classon's first priority Foreclosure Judgment under New York law, the 159 Objectors nonetheless maintain in conculsory form

435896/002-4302006.4

that they have a senior constructive trust interest in the Property which trumps all other liens and interests. They are simply wrong.

9. New York law requires four elements to prove a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment. *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976). The party seeking to impose a constructive trust carries the burden of proving the facts warranting its imposition. *Cassidy v. Cassidy*, 309 N.Y. 332, 335, 130 N.E.2d 881, 882 (1955). In particular, the claimant has the burden to establish the original trust relationship; must provide title; identify the trust fund or property; and be able to trace the funds claimed to be transferred to the property over which the claimant seeks to impose a constructive trust. *Majutama v. Drexel Burnham Lambert Grp.*, 142 B.R. 633, 637 (S.D.N.Y. 1992) (citing *Salisbury Inv. Co. v. Irving Trust Co. (In re United Cigar Stores Co.)*, 70 F.2d 313, 316 (2d Cir. 1934))).

10. The 159 Objectors collectively filed eighteen (18) proofs of claim in the Debtor's bankruptcy case. Each proof of claim alleged a "security deposit and constructive trust" with respect to the unit(s). The 159 Objectors did not provide any supporting documentation to substantiate their claims. Thus, the 159 Objectors have failed to meet their burden of demonstrating facts sufficient to warrant imposition of constructive trusts against the Debtor. There is no proof that a contract existed between the Debtor and the 159 Objectors with respect to the Property. Additionally, the 159 Objectors do not provide any evidence that any funds were ever transferred between the 159 Objectors and the Debtor and are unable to trace these alleged deposits to any interest held in the Property.[6] New

---

[6] It goes without saying that neither CPC nor Classon ever received any such deposits, as was required under the mortgage agreements.

7

York law necessitates that a claimant meet all four requirements to successfully impose a constructive trust. Based on the foregoing, the 159 Objectors have clearly failed to meet their burden of proof, and thus cannot impose constructive trusts against the Debtor.

## IV. Classon's Mortgages Have First Priority

11. Even if the Court were to find that the 159 Objectors could somehow impose constructive trusts against the Debtor, which the Classon Entities respectfully submit they have failed in their burden to prove, the 159 Objectors' claims based on constructive trusts are insufficient to defeat or overcome the first priority given to Classon's mortgages. *See ABN AMRO Mortg. Grp., Inc. v. Pantoja*, 91 A.D.3d 440, 936 N.Y.S.2d 163 (1st Dep't 2012) (holding that a mortgage which was first recorded has priority over later recorded mortgage and deed) (construing N.Y. REAL PROP. L. § 291 (McKinney 2013)); *Cadlerock Joint Venture, L.P. v. Khan*, 713 N.Y.S.2d 276, 277 (N.Y. Sup. Ct. 2000) ("A review of statutory and case law history evinces the courts' and the Legislature's emphasis on first mortgagee's interest over and above all other liens."); *Bank of Lake Placid v. Rhino*, 444 N.Y.S.2d 562, 563 (N.Y. Sup. Ct. 1981) (holding that the defendant's claim was not entitled to priority over the mortgage, where the order relied upon by the defendant was not a money judgment docketed prior to the recording of plaintiff's mortgage); *see also Dime Savings Bank of New York, F.S.B. v. Pesce*, 93 N.Y.2d 939, 941, 693 N.Y.S.2d 66, 715 N.E.2d 93 (1999) (holding that even the condominium association's interest in rent was subordinate to the first mortgagee's interest). Courts in New York have uniformly rejected attempts by claimants to prioritize hidden agreements or unrecorded interests in the property over perfected interests. *See Sav. & Loan Ass'n of Kingston v. Berberich*, 24 A.D.2d 187, 189, 264 N.Y.S.2d 989, 991 (N.Y. App. Div. 1965) (finding that claimant had, at most, an equitable lien

8

created by an unrecorded agreement to give a mortgage, which was subordinate to lien of prior mortgage); *Suffolk Cnty. Fed. Sav. & Loan Ass'n v. Geiger*, 291 N.Y.S.2d 982 (N.Y. Sup. Ct. 1968).

12.   Here, Classon has perfected, first priority mortgages in the Property and a Foreclosure Judgment. Any alleged interests the 159 Objectors may have in the Property are the subject of hidden agreements in Hebrew or unrecorded interests as evidenced by their failure to show up on a title search conducted by Classon prior to acquiring the mortgages. Pursuant to New York legal precedent, these claims would at best be subordinate to the mortgages. Thus, the mortgages are senior to all other claims against the Debtor, including any alleged claims made by the 159 Objectors.

V.   **The Alleged Contracts Are Illegal, Unenforceable and In Violation of New York Law**

13.   Under New York law, the Martin Act (the "Act") authorizes the Attorney General to investigate and enjoin fraudulent practices in the marketing of stocks, bonds and other securities within or from New York State. N.Y. GEN. BUS. LAW §§ 352, 353 (McKinney 2013). The Act also makes it illegal for a person to make or take part in a public offering of securities consisting of participation interests in real estate (including the offer and sale of cooperative apartments and condominiums) unless an offering statement is filed with the Attorney General. N.Y. GEN. BUS. LAW § 352–e (1)(a). In conjunction with these prohibitions, the Act prescribes numerous other rules and regulations that must be followed in connection with any such transactions.

14.   The Attorney General bears sole responsibility for implementing and enforcing the Act; there is no private right of action under the statute. *Kralik v. 239 E. 79th St. Owners Corp.*, 5 N.Y.3d 54, 58, 799 N.Y.S.2d 433, 832 N.E.2d 707 (2005); *CPC Int'l. v.*

9

*McKesson Corp.*, 70 N.Y.2d 268, 276–77, 519 N.Y.S.2d 804, 514 N.E.2d 116 (1987 ).  A private litigant may not pursue a common law cause of action where the claim is predicated solely on a violation of the Act or its implementing regulations and would not exist but for the statute.  *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 18 N.Y.3d 341, 353, 962 N.E.2d 765, 770 (2011).

15.    Here, without identifying the statute, the 159 Objectors seek essentially to pursue claims under the Act against the Debtor for engaging in the solicitation of sales of condominium units in violation of the statute.  Such pursuit contravenes the Attorney General's exclusive authority to enforce the Act.  Rather, the appropriate remedy for the 159 Objectors to pursue is to petition the Attorney General to initiate an action on their behalf.

16.    Even if the 159 Objectors have standing to bring an action under the Act, they are essentially seeking protection under a statute that their own claims demonstrate they knowingly violated.  The 159 Objectors knowingly entered into Hebrew contracts that were in violation of and expressly not subject to New York law and chose to operate outside of the protections afforded by not just the Act, but by United States law as whole; therefore, they should not receive the benefits and protections of the Act and do not come before this Court with clean hands.

17.    Furthermore, contracts which violate statutory provisions are unenforceable on public policy grounds where the statute's "purpose [is] the protection of public health or morals or the prevention of fraud."  *Benjamin v. Koeppel*, 85 N.Y.2d 549, 554 (1995).  "A party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his

claim, must show forth his illegal purpose." *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 469, 166 N.E.2d 494, 496 (1960) (internal quotation marks omitted).  Here, the 159 Objectors are seeking the protection of a statute they knowingly and willfully violated and should not be provided such protection by this Court.

### VI. The Alleged Contracts Also Violate the terms of the Mortgages

18. In addition to violating applicable law, the 159 Objectors' secret contracts, assuming they exist, also violate the terms of Classon's mortgages.  The mortgages provide that "all rents, royalties, issues, profits, revenue, income and other benefits of the Mortgaged Property . . . " shall be given to the Mortgagee.  Mortgages § F(v).  CPC, as mortgagee, and now Classon as assignee of the mortgages, never received the alleged deposits from the 159 Objectors.  Since the mortgages require that any monies received with respect to the Property must go to the mortgagee, if the 159 Objectors did provide deposits as they claim to have done, they did so in violation of the terms of the publicly recorded mortgages.

### VII. The 159 Objectors' Alleged Claims, If Valid, Are Equity Claims Which Are Subordinated Under Section 510(b) of the Bankruptcy Code

19. Section 510(b) of the Bankruptcy Code provides that "a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security . . . ."  11 U.S.C. § 510(b).  Thus, section 510(b) prohibits equity holders from elevating their claims from the level of equity to that of a general unsecured claim.  "If the security is an unsecured debt instrument, the claim that is represented by that security is a general, unsecured claim.  Since the claim represented by the instrument is a general

11

unsecured claim, any claim for rescission will be subordinated until the claims of the general unsecured creditors have been satisfied." COLLIER ON BANKRUPTCY ¶ 510.04[1] (16th ed.).

20. The language of section 510(b) does not limit its application to any particular type of claim but, rather, focuses on the type of claim possessed. *In re PT-1 Communications, Inc.*, 304 B.R. 601, 609, 610 (Bankr. E.D.N.Y. 2004). Under the broad reading of this statute, the claim need not flow directly from the securities transaction or arise contemporaneously with the purchase or sale of a security, but will be viewed as "arising from" a securities transaction if the transaction is part of the causal link leading to the injury. *In re Granite Partners, L.P.*, 208 B.R. 332, 339 (Bankr. S.D.N.Y. 1997). Thus, a claim may be treated as equity and subordinated even where the claimants never received shares they were due and never had an opportunity to share in the benefits of ownership. *See e.g.*, *In re Med Diversified*, 461 F.3d 251 (2d Cir. 2006) (subordinating claim arising out of debtor's failure to issue stock to claimant, which had violated debtor's contractual obligation to exchange shares of its stock in exchange for the claimant's shares of another company).

21. In keeping with the broad reading of section 510(b), the 159 Objectors' claims against the Debtor, if the Court should somehow find such claims valid and enforceable, should be subordinated to all other claims, including the mortgages. According to the 159 Objectors' alleged contracts with the Debtor's principals, each 159 Objector purchased a "partnership interest" in the Property. This partnership interest is clearly an equity interest. The parties then appear to have agreed that their partnership interests would be satisfied through the sale of a condominium unit to them with a credit towards the purchase price for the alleged sum advanced for their partnership interest. However, their attempts to provide for a mechanism for satisfying their partnership interest through a credit on a sale of a unit,

12

does not somehow elevate their equity interest to a secured or unsecured claim. It is still an equity interest, junior to all claims. Section 510(b) makes this clear. Under section 510(b), any claims the 159 Objectors may have against the Debtor should still be treated as equity even if the basis for the claim is breach of a partnership agreement to provide the 159 Objectors with a credit towards the purchase of a condominium unit in satisfaction of their partnership interest.

## **CONCLUSION**

22. The 159 Objectors bear the burden of proving that they can impose constructive trusts against the Debtor. For the reasons explained above, the Classon Entities respectfully submit that the 159 Objectors have failed to do so here. Even if the Court were to find that the 159 Objectors could successfully impose constructive trusts against the Debtor, New York law provides that a perfected first priority mortgage is senior to all other interests against the property. The mortgages have been properly perfected, and the Foreclosure Judgment is final and conclusive. Thus, any alleged claims the 159 Objectors may have against the Debtor are as a matter of law junior in priority to the mortgages. Additionally, to the extent valid contracts exist, which the Classon Entities refute, the (i) 159 Objectors knowingly entered into such agreements in violation of New York law, thus precluding their rights to receive the protections of any such laws and (ii) such claims should be treated as equity interests and subordinated to all other claims, including the mortgages.

23. Finally, the 159 Objectors have consistently taken steps to thwart the Debtor's ability to sell the Property. They have provided no justification for doing so and no

substantiation of their claims against the Debtor.  Such actions are unwarranted and should not preclude the sale from closing with Classon I as the Successful Bidder.

WHEREFORE, the Classon Entities respectfully request that this Court (i) grant the relief sought in the Motion, (ii) overrule the Objection and (iii) grant such other and further relief as may be just and proper.

Dated:  New York, New York
July 10, 2013

**HAHN & HESSEN LLP**

By: /s/ *Mark T. Power*
Mark T. Power

488 Madison Avenue
New York, New York 10022
(212) 478-7200

*Counsel for Classon Estates LLC and Classon Estates I LCC*

14

EXHIBIT A

EXHIBIT A

13-22198-rdd    Doc 72    Filed 07/10/13    Entered 07/10/13 20:01:24    Main Document
Pg 15 of 16

B256 (Form 256 – Subpoena in a Case under the Bankruptcy Code) (12/07)

# UNITED STATES BANKRUPTCY COURT

SOUTHERN District of NEW YORK

In re PARK SIDE ESTATES, LLC,
Debtor

**SUBPOENA IN A CASE UNDER THE BANKRUPTCY CODE**

Case No. * 13-22198 (RDD)

To: CLASSON ESTATES LLC
c/o Mark T. Power Esq.
Hahn & Hessen, LLP
488 Madison Ave.
New York, N.Y. 10022

Chapter 11 Reorganization

☐ YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): All Documents, consisting of, referring or relating to
1. Assignment of the Loan to ClassonEstates LLC, including consideration paid therefor
2. All deposits made by the Buyer under the Real Estate Contract, 3. All Agreements referred to in the Real Estate Contract, including Loan Participation Agreements, Option Agreements and Consulting Agreements, and amount and location of any deposits thereunder * (see below)

| PLACE Offices of Leo Fox<br>630 Third Ave<br>New York, N.Y. 10017 | DATE AND TIME<br>July 1, 2013<br>10 a.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this proceeding that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Rule 30(b)(6), Federal Rules of Civil Procedure, made applicable in bankruptcy cases and proceedings by Rules 1018, 7030, and 9014, Federal Rules of Bankruptcy Procedure.

| ISSUING OFFICER SIGNATURE AND TITLE<br>*[signature]* Atty for Objectant | DATE<br>6/21/13 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER
Leo Fox 630 Third Ave N.Y. N.Y. 10017  212 867-9595

* If the bankruptcy case is pending in a district other than the district in which the subpoena is issued, state the district under the case number.

*4. All efforts by parties to market the Debtor's real property